𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

NATIONAL BANK OF VIRGINIA v. CRINGAN ET ALS.

APRIL 18, 1895.

1. PARTNERSHIP—*Powers of Partners Before and After Formation.*—Prior to the actual existence of a partnership, though one be in contemplation, there is no implied power in one partner to bind the firm. That agency only arises when the partnership is actually in existence, and is then limited to matters necessary to the business of the firm in the ordinary way. Nor can one partner after the partnership is formed pledge the credit of the firm to raise his input of its capital unless specially authorized to do so. This is not among his implied powers.

2. PARTNERSHIP—*Liability on Note of One Partner for input—Burden of Proof.*—A note made by one partner and endorsed by another, in order to raise money for the input of the maker, is not the debt of the firm unless there was previous authority thus to bind the firm, or there has been a subsequent ratification of the transaction by the firm; and the burden of proof is on the holder to show such authority or ratification. In the case in judgment this has not been shown.

3. PARTNERSHIP—*Credit to One Partner—Election—Public Partnership—Dormant Partner.*—If credit is extended to one member of a partnership which is public, he alone is liable, even though the money, property, or other contract, is for the use and benefit of the firm, or is applied thereto. This is because the creditor has elected to take the individual security, and he will be held to his election. But if no partnership was known to exist, or if there were dormant partners, the firm will be liable for the acts of the partner done within the scope of his authority—that is, necessary for the conduct of the partnership in the ordinary way ; otherwise, the measure of the liability of the dormant partner is the same as if he had been a known partner—he is liable for the debts of the firm, not for those of the individual partners.

4. PARTNERSHIP—*Avowed Partners—Dormant Partners—Section 2877 of Code.*—Section 2877 of the Code does not apply to an avowed partnership of two or more persons doing business under a name which shows that it is

in fact a partnership, and discloses full names of at least two of the partners. If there are other partners whose names are not thus disclosed, they will be liable as general partners, when avowed or discovered. But even if the statute did apply, the trader whose assets are liable for his debts is the *firm* which thus held itself out as the owner of the assets.

Appeal from a decree of the Chancery Court of the city of Richmond, pronounced March 4, 1892.

*Affirmed.*

The opinion states the case.

*Christian & Christian,* for the appellant.

*Coke & Pickrell* and *Legh R. Page,* for the appellees.

HARRISON, J., delivered the opinion of the court.

This is an appeal from a decree of the Chancery Court of the city of Richmond, pronounced on the 4th day of March, 1892. In deciding the case the learned chancellor of that court delivered the following opinion, which is filed with and made a part of the record:

"This is a bill to charge W. S. Forbes and W. L. Boyd, as secret partners in the firm of Cringan & Trant, on a note for $5,000, dated July 6, 1889, drawn by John W. Cringan to the order of E. L. Trant, payable at four months from date, and endorsed by Trant, and discounted by the plaintiff bank. The note in suit was given in renewal for the third time of a similar note, dated June 29, 1888, and discounted on that day by the plaintiff.

"The evidence shows that prior to June 29, 1888, Jno. W. Cringan, E. L. Trant, and W. S. Forbes had agreed to form a partnership to conduct the wholesale grocery business in the city of Richmond, to commence business on or about July 1, 1888. The firm did commence business on July 2, 1888, and

about the last of that month W. L. Boyd was admitted as a partner, his interest to relate back to the beginning of the business. The firm was dissolved in September, 1889, by the death of Trant.

"On or shortly before June 29, 1888, Cringan applied to the plaintiff bank for a loan of $5,000 to make up his input of capital in the concern, offering his note endorsed by Trant; and on June 29 the loan was made, the proceeds of the note being placed to the credit of Cringan on the books of the bank, and on July 6 it was checked out by Cringan and placed to the credit of Cringan & Trant on the books of the bank.

"In applying for the loan, Cringan informed the cashier of the bank (Lockwood) that Trant and himself had agreed to form the partnership, and that he (Cringan) wanted the money to make up his input of capital; but he did not tell the cashier that there were to be other partners than Trant and himself (Forbes having requested that his connection with the firm should not be made public, and it not being then contemplated that Boyd would be a partner), and the cashier did not ask him that question.

"When the note matured it was renewed in the same form, discounted by the bank, the proceeds of the new note placed to the credit of Cringan & Trant on the books of the bank, and the old note charged up to that account; and this was repeated at each renewal of the note, of which there were three.

"After the dissolution of the firm in September, 1889, by the death of Trant, Cringan sold out his interest to Forbes and Boyd for $1,000 in cash, and any interest he might have after the debts were paid; and Forbes and Boyd took possession of the assets, then amounting to something like $20,000, and proceeded to apply them to the payment of the debts of the firm. The bank did not know that Forbes and Boyd were

partners in the concern until after the dissolution; and the note held by it not having been paid, this suit was brought to charge Forbes and Boyd as dormant partners.

"It would subserve no good purpose to go more into the details of the evidence at this point; such parts of it as are deemed material will be noticed in their proper connections in what follows.

"It seems to me that the vital inquiries in this case (independently of the statute, presently to be considered), are these: 1. Did Cringan on June 29, 1888, have the power, express or implied, to bind the firm of Cringan & Trant in this transaction? 2. If *nay*, has his action been ratified by his co-partners, so as to be binding on the firm?

"1. It is not pretended that at that time Cringan had any *express* power to bind his firm; this is a question of fact. Whether or not he had any *implied* power is a question of law. If there was at that time no existing partnership, then he had no such power; for prior to the actual existence of a partnership there is no implied power in one partner to bind his firm; that agency only arises when the partnership is actually in existence, and then, of course, only in matters necessary to the business of the concern in the ordinary way. See 1 Bates on Partnership, §§ 78, 80, and 221; 1 Lindley on Partnership, * p. 385 *et seq.;* Story on Partnership, § 122 a.

"I am clearly of opinion that on June 29, 1888, the partnership of Cringan & Trant was not in existence. There was at that time an executory contract or agreement between Cringan, Trant, and Forbes to form a partnership, to go into effect on or about July 1, 1888. That such an agreement does not constitute a partnership, see 1 Bates, §§ 78, 80; 1 Lindley, * pp. 26, 29, 385 *et seq.*, and notes. In contemplation of law, and as a matter of fact, the partnership did not come into existence until July 2, 1888, when the joint adventure was "launched," as it is called in the books. This is

shown by the evidence, oral and documentary, in the most satisfactory way, as, 1, by the articles of partnership, dated July 2, 1888, (though actually written subsequently to that date); 2, by the printed circular of Cringan & Trant, bearing the same date, saying that the parties 'have this day formed a co-partnership;' 3, by the positive testimony of Cringan, Forbes, and Boyd; 4, by the allegations, on page 1 of the bill, sworn to by the cashier, 'that on June 29, 1888, one John W. Cringan represented to him [the cashier] that he, the said Cringan, and one E. L. Trant were about to form a co-partnership,' which statement is substantially repeated in his deposition; 5, from the testimony of the cashier, 'that. the firm had not (to my knowledge) come into existence legally when the note was first given; if it had, I certainly would have made them endorse it 'Cringan & Trant,' and would not have accepted it otherwise.  *  *  *  'Mr. Cringan informed me that the partnership only dated from the 1st or 2d July,' and 6, from the books of the concern.

"But even if the partnership had been in existence on June 29th, I should nevertheless be of opinion that Cringan had no authority to bind it for his input of capital, even if he had intended and attempted to do so.  It is not among the implied powers of a partner to bind his firm for his own share of the capital agreed to be subscribed.  Says Mr. Justice Lindley:

" 'One of the implied powers of a partner, and one of the most important of his powers, is that of borrowing money on the credit of the firm; but this power, like every other implied power, only exists where it is necessary for the transaction of the partnership business in the ordinary way; and consequently, if money is borrowed by one partner for the declared purpose of increasing the partnership capital, or of raising the whole or a part of the capital agreed to be subscribed in order to start the firm,  *  *  *  the firm will not be bound unless some actual authority or ratification can

be proved.' 1 Lindley, * pp. 269, 273-4; 1 Bates, §§ 446 and 371; Story, § 148.

"And again the same author: 'Although each member of an ordinary trading partnership can pledge its credit for money borrowed in order to carry on its business, he cannot render it liable to repay money borrowed by him to enable him to furnish the amount of capital which he has agreed to bring in.' 1 Lindley, * p. 611.

"There can be no doubt here that Cringan borrowed the money to make up his input, and that he distinctly informed the cashier of that fact at the time. Cringan swears positively that he so informed the cashier, and he is strongly corroborated, as we shall presently see, by a memorandum made by the cashier at the time, and laid before the board of directors of the bank. The cashier denies this, and says that Cringan told him that the money was to make up the capital of the concern, but not to make up Cringan's input. But even if this be true, it was as much beyond Cringan's power to bind the firm to raise or increase its capital as it was to bind it for his own input.

"2. It is equally clear from the evidence that Cringan's action has not been ratified by his co-partners. There is, indeed, nothing approaching a ratification, except the fact that at each renewal of the note the matured note was charged up on the books of the bank to the account of the firm, and the proceeds of the new note credited to that account. But in each instance the new note was made in the same form as the original (drawn by Cringan to the order of Trant, and endorsed by Trant), and the discount and the old note were charged up on the books of the firm to the account of Cringan. The notes were never placed on the bills-payable book of the firm until at the time of the last renewal, when it was done by the bookkeeper of his own motion, which act was promptly repudiated by the partner, Boyd, when he discovered it after

the dissolution of the firm.   Neither Forbes nor Boyd knew
of the existence of the note for about one year after the part-
nership was formed, nor did either of them know that this
bank held it until about November, 1889, after the firm had
been dissolved.   It is alleged by the plaintiff that these re-
newals were made at the request of the firm, and that the old
notes were charged by the bank to the account of the firm,
and the proceeds of the new notes credited to that account,
by like request; but this is denied by Cringan, and certainly
is not proved by the evidence.   Cringan says that he himself
requested the renewal of the note when it was first renewed,
and that the bookkeeper for the firm attended to it at the sub-
sequent renewals; and he denies that he requested or directed
that the old notes should be charged, and the proceeds of the
new notes credited, to the account of the firm.   Such request
could not have been made by the firm, for Forbes and Boyd
did not even know of the existence of the note; and of course
the renewal at Cringan's request would not make the note
binding on the firm.   That no such request was made by the
firm is well established by the fact that the form of the note
was not changed, nor was the firm's endorsement asked for by
the cashier, for the cashier swears that if the firm had been
in legal existence (to his knowledge) on June 29, he would
certainly have made them endorse it 'Cringan & Trant,' and
would not have accepted it otherwise.   And yet he did not
make them so endorse it at either of the three renewals.   This
not only completely repels any presumption of ratification
by the firm, but furnishes a very reasonable presumption that
the cashier did not desire such ratification.   It can scarcely
be doubted that this method of charging and crediting was
adopted for convenience merely, as neither Cringan nor Trant
kept an individual account at that bank, just as other indivi-
dual notes of both Cringan and Trant were charged up to the

firm account on the books of the bank.    It certainly falls far
short of a ratification by the firm.

"Now if it has been established that Cringan had no authority
to bind his firm by this note, and that his co-partners have not
ratified his action, that of itself sufficiently disposes of this
branch of the case, and this opinion might properly close here.
But there are other views of the case which may be presented
without impropriety, and certain contentions of the counsel
for the plaintiff which should be noticed.

"Thus, I am fully satisfied that this note is the individual
obligation of Jno. W. Cringan and E. L. Trant, and not that
of the firm of Cringan & Trant.    The evidence is to my mind
entirely satisfactory on this point, but I can only notice briefly
a few of its leading features.

"In the first place the form of the note makes it *prima
facie* the individual obligation of the maker and endorser,
and not that of the firm in which they were partners.    The
burden is therefore on the bank to show that it is the obliga-
tion of Cringan & Trant.    This is attempted by the cashier by
showing that he understood at the time that the loan was for
the benefit of the firm, and that the money was wholly used
in the firm's business.    The latter statement is not disputed,
but, as we shall see, that of itself is far from making it a firm
obligation.

"Again: Cringan swears positively, both in his answer and
in his deposition, that he borrowed the money for himself, to
make up his input, and that he distinctly so informed the
cashier at the time, and he indignantly denies that he intended
or attempted to bind the firm.    His evidence, I think, is
strongly corroborated by the sworn statement of the cashier,
as to what occurred at that time, as made on page 1 of the
bill; and still more strikingly by a memorandum which the
cashier made and submitted to the board of directors of the
bank when he laid before them Cringan's application for the
loan.    That memorandum, in the handwriting of the cashier,

is as follows: 'J. W. Cringan wants $5,000, at four months, endorsed by E. L. Trant. He says he has put in $15,000 and wants $5,000 in addition to make it $20,000. His money is tied up with Cringan, Watkins & Co., and is unavailable at present.'

"Again: Trant certainly must have understood this to be a loan to Cringan, for he opened the books of Cringan & Trant and credited Cringan's stock account with this $5,000, and charged him on his individual account with the discount.

"Lastly: The proceeds of the note were placed by the bank on its books to the credit of Cringan, although he had no account there, and although it had been agreed that the firm of Cringan & Trant should keep its account there, and that firm was to begin business three or four days afterwards. The money was actually checked out by Cringan on July 6 and placed to the credit of Cringan & Trant. Moreover, the cashier says that in the ordinary course of business the money would·have been credited to Trant, but that he was instructed by Cringan to put it to his (Cringan's) credit. All this is very persuasive to show that the cashier recognized in Cringan the real owner of the money and acknowledged his dominion over it. In fact, after the most attentive consideration of his and Cringan's testimony, I am unable to escape the conviction that it was well understood between them on June 29 that Cringan was the real borrower of the money, with Trant as his endorser; and that while the cashier thought that they alone composed the firm, yet that he did not consider that he was giving credit to the firm. I do not know how otherwise to explain his repeated statements that the firm had not then come into legal existence: 'If it had, I certainly would have made them endorse it 'Cringan & Trant,' and would not have accepted it otherwise.' And in answer to the 18th cross-question he says: 'It was a note of the individuals composing the firm, and not a note of the firm, for it had not then come into existence; and I regarded it as an obligation of the indi-

vidual members composing the firm of Cringan & Trant.' I think this must be taken to mean that he credited J. W. Cringan and E. L. Trant, the firm being then unborn. Whether or not, had the firm then been in existence, he would have insisted on the firm's endorsement, we can only judge by the fact that he failed to do so subsequently, although three opportunities were offered him.

"If, then, this was the individual obligation of J. W. Cringan and E. L. Trant it would not be binding on the firm of Cringan & Trant, even though the money was wholly used in its business, if that firm was open and notorious; that is, if there were no dormant partners. And this brings us to the main contention of the counsel for the plaintiff, which is pressed with great force in his closing note.

"The principal which exempts a partnership from liability for the individual obligations of one partner, even though given for money or goods brought into the concern, is that the creditor has made his election between the security of the firm on the one hand, and that of the individual partner on the other; and having chosen to look to the latter, he must abide his own decision. But where no firm was known to exist, or where there were dormant partners, the creditor cannot be held to have made an election, and he may therefore charge the firm, or the dormant partners, when discovered. Mr. Story says: 'If money is borrowed, or goods bought, or any other contract is made by one partner upon his own exclusive credit, he alone is liable therefor; and the partneship, although the money, property, or other contract is for their proper use and benefit, or is applied thereto, will in no manner be liable therefor.' Story on Partnership, § 134.

"And again he says in § 138: 'In the case of a dormant or secret partner, the credit is manifestly given only to the ostensible party, for no other party is known. Still, however, it is not treated as an exclusive credit, for the law in all cases

of this sort founds its decision upon the ground that the creditor has had a choice or election of his debtor, which cannot be where the partner is dormant and unknown. The credit, therefore, is not deemed exclusive, but binding upon all for whom the partner acts, if done in their business, and for their benefit, as is the case in cases of agency for an unknown principal.'

"In *Holmes* v. *Burton*, 9 Vermont, 252, 31 Am. Dec. 621, it was held that a note given by one partner, in his individual name, cannot be enforced against the partnership, though made in consideration of property of which the firm had the benefit. 'This rule holds where the partnership is public, although it may not apply to the case of a dormant partnership. It goes upon the ground that the creditor elects to take the individual security.' See also 1 Bates, § 157, and cases cited; *In re Warren*, Davies [U. S. C. C. Rep'ts,] 320.

"The counsel for the plaintiff contends that this case falls within the exception to the rule; that even if the credit was in fact given to Cringan, yet, this being a dormant partnership, the firm is nevertheless liable, the money having gone to the benefit of the firm.

"It seems to me that the complete answer to this is that Cringan had no authority to bind the partnership in this matter, and that his action has not been ratified by his co-partners; and if he could not bind the partnership, he could not bind the dormant partners, for their liability, when discovered, is exactly what it would have been had they been known as partners from the beginning; that is to say, they are liable for the debts of the firm, not for those of the individual partners.

"If Cringan had borrowed this money after the firm came into existence, on his own note, whether endorsed by Trant or not, and for the purpose of carrying on the business of the concern in the ordinary way, and not to increase the firm's

capital, nor to make up his own input, then, even though the credit was given in the first instance to Cringan alone, the firm (this being a dormant partnership) would nevertheless be bound for the debt, and hence the dormant partners would be liable to pay it.    The case would then fall easily within the exception to the rule, and the views of the counsel for the plaintiff would prevail.

"But such is not the case.    Cringan borrowed the money before the partnership came into existence.    At that time he had no implied power to bind the firm, and no express authority nor any ratification of his act has been shown.    He borrowed the money to make up his input of capital, and so informed the lender at the time; but he had no implied power to bind the partnership for the purpose of raising the capital which he himself had agreed to bring in, and no express authority nor any ratification of his act has been shown.

"To recur again, and briefly, to the principles above laid down: If credit is given to one member of a known firm, the firm is not liable for the debt, even though the fruits of the credit go to the benefit of the firm; the creditor has made his election to credit the individual partner; but if no partnership was known to exist, or if there were dormant partners, the firm will be liable, for the creditor cannot be held to have made an election.    But there is another principle which underlies both of these, viz.: That the act done must be within the scope of the partner's authority; that is, it must be necessary to the conduct of the business of the partnership in the ordinary way.    The authorities show this very clearly. I have examined the cases cited by counsel for the plaintiff, and many others, and in each of them I find that there was an existing partnership, and that the act of the partner was done in the usual course of the business of the concern.

"It now becomes necessary to examine the Virginia statute which is invoked by the plaintiff.

"It is strenuously insisted, and as strenuously denied, that section 2877 of the Virginia Code governs this case; and that even if the court should reach the conclusions above set forth, yet that the claim prosecuted here is undoubtedly the individual debt of J. W. Cringan and E. L. Trant; and that, being such, the statute makes the assets of the firm of Cringan & Trant, all of which have come into the hands of Forbes and Boyd, liable for its payment.   The section reads as follows:

" ' If any person transact business as a trader, with the addition of the words ' factor,' ' agent,' ' and company,' or ' and co.,' and fail to disclose the name of his principal or partner, by a sign in letters easy to be read, placed conspicuously at the house wherein such business is transacted, and also by a notice published for two weeks in a newspaper (if any) printed in the city, town, or county wherein the same is transacted ; or if any person transact such business in his own name, without any such addition ; all the property, stock, and choses in action acquired or used in such business shall, as to the creditors of any such person, be liable for the debts of such person.'

"Since the business here was conducted under the firm name of 'Cringan & Trant,' without the addition of any words, it is the latter clause of the statute which is particularly relied on—viz: 'Or if any person conduct such business in his own name, without any such addition; all the property, stock, and choses in action acquired or used in such business shall, as to the creditors of any such person, be liable for the debts of such person.'

"I have considered this matter very attentively; in fact, the evident sincerity of the counsel for the plaintiff in pressing it has induced me to bestow on it far more thought than I would otherwise have considered necessary.   The result is that I am satisfied that the statute does not apply, and was not meant to apply, to such a case as this.   No authority was cited on either side in the argument, and I have not been able to find any, bearing on this point.

"The position of the plaintiff is this: Conceding that the

debt here is not the debt of the firm of Cringan & Trant, but the individual debt of J. W. Cringan and E. L. Trant, yet, inasmuch as J. W. Cringan and E. L. Trant conducted the business in their own names (*i. e.*, in the firm name of Cringan & Trant), without the addition of the words mentioned in the statute, the assets of the firm of Cringan & Trant are expressly made liable for the payment of this debt. Which is, of course, equivalent to saying that by virtue of this statute it is the law in Virginia that partnership assets are impressed with a statutory lien or charge in favor of the individual creditors of the members of the firm. If this be so, it involves very serious consequences. I think it effectually destroys the equity of the partners *inter sese* to have the partnership assets first applied to the payment of the partnership debts; and hence the creditors of one partner (or, as in this case, of two of the partners), who might be heavily indebted, could take the social assets *pari passu* with the social creditors, and leave the other partners to pay the whole of the social debts remaining unpaid. I am not sure, indeed, that in such a case the individual creditors would not have priority over the social creditors. I think that if this had been the real meaning and effect of the statute, it would very likely have been discovered during the half century that it has been on our statute books.

"It seems to me very plain that the statute applies only to the case of a person trading in his own name, either with the addition of words which indicate that he is an agent or has a partner, but which do not disclose the name of his principal or partner, or else without any such words; and its effect is to make the assets used or acquired in such business liable for the debts of such trader. I believe that there is a consensus of opinion in the profession that the statute was intended to meet the common case of a person trading in his own name, either with or without the words 'agent,' or 'company,' and obtaining credit, presumably on the faith of the assets used in

such business, and then, when the necessity arises, shielding those assets from the demands of his creditors by claiming that they belong to his principal or to his partner. The statute is aimed at the fraud which might be, and no doubt often was, practised in this way, and it prevents the fraud by making the assets used or acquired in such business liable for the debts (all the debts) of such person, unless the name of his principal or partner be disclosed in the manner prescribed. An examination of the language of the statute, as first enacted in 1839, will materially aid this construction. The act is entitled 'An act to prevent persons from carrying on business under false or fictitious names and firms,' and its full text is as follows:

" ' Be it enacted by the General Assembly, That no person shall transact any business whatever, in the co-partnership name and style of himself and any other person, who is not liable for the debts incurred in the course of business; and no person shall transact business in his own name, with the addition of the words 'agent' or 'factor,' merely, without adding thereto the name of his principal; and no person shall transact business under his own name, with the addition of the words ' and company ' or ' & Co.,' unless some actual partner be represented thereby. And if any person shall offend against the provisions of this act, or either of them, he or she shall be guilty of a misdemeanor, and for each offence shall be punished by a fine of not less than one hundred, nor more than one thousand dollars.

" ' 2. And be it further enacted, That all property, debts, stock, and choses in action acquired by any person trading or transacting business in his own name, with the addition of the words 'agent,' 'factor,' ' and company,' or ' & Co.,' and who does not disclose the name of the principal or partner liable for the payment of all the debts incurred in the course of his business, shall, as to all creditors of such person, be taken to be his individual property, and liable to his debts, as if it were acquired solely on his own account.' Acts 1839, ch. 72, p. 45.

"The only cases in which the statute has come under review in our Supreme Court of Appeals were cases of agency. See *Farmers Bank* v. *Kent, &c.*, 16 Gratt. 257; *Penn* v. *Whitehead*, 17 Gratt. 508, 524.

"Neither the terms of the statute nor the policy of the

law requires, or even permits, that it should be applied to an avowed partnership of two or more persons doing business under a name which shows that it is in fact a partnership, and discloses the names of at least two of the partners. There is nothing false or fictitious in the name 'Cringan & Trant.' It shows on its face that there is a partnership, and discloses the names of two persons who, in the language of the original act, are 'liable for all the debts incurred in the course of the business;' and if there are other partners who are not thus disclosed, they will be equally liable, when avowed or discovered, for all such debts. On the other hand, the name 'John Smith,' or 'John Smith, Agent,' or 'John Smith & Co.,' may be fictitious; there may or may not be a partnership or agency; and if there is, the statute requires that the name of the partner or principal shall be posted at the door and published in a newspaper; else John Smith is estopped from asserting that fact against the demands of his creditors.

"There is no statute in Virginia requiring a firm of general partners to disclose their names on a sign at the door and by advertisement in a newspaper, although limited patnerships and partnership associations are required to disclose names, advertise, and record articles; and the statute under consideration requires a person doing business as a trader, where his name is the only ostensible name, and the only indication of a partnership is the words 'and company,' or '& Co.,' to have such sign and make such advertisement. When we consider the fact that the great majority of all partnerships are general partnerships, this absence of any such requirement as to them seems to have some significance. I also think that there is great significance in the word 'person,' so often used in the statute, notwithstanding the rule of construction which permits a word importing the singular number to be extended and applied to several persons or things, (Code of Virginia, section 5, clause 13), especially when we consider the language of the original act.

"Again: The trader contemplated by the statute is a person doing business as a trader. In this case neither J. W. Cringan nor E. L. Trant, separately or jointly with each other, transacted business as a trader. The firm of Cringan & Trant, composed of Cringan, Trant, Forbes, and Boyd, was the person, or trader, who transacted business without complying with the statute. The partnership was an entity entirely distinct from either of its component parts. If this trader is within the terms of the statute, and has failed to comply with its provisions, the penalty is that its assets are liable to the payment of its debts; and the force of the statute so applied is simply that the assets of the trader, Cringan & Trant, are liable for the debts of the trader, Cringan and Trant; and that is the law independently of the statute. But the debt here is not the debt of Cringan & Trant, and the contention of the plaintiff is based on the concession of this fact. So that even if the statute be made to apply in this way it does not help the plaintiff.

"The arguments on this point are by no means exhausted, but these must suffice.

"I am of opinion to dismiss the bill, and a decree may go accordingly."

We have carefully examined the record, and find that our views of this case are fully and clearly expressed in the opinion of Judge Lamb, which this court adopts; and for the reasons therein given we are of opinion that there is no error in the decree complained of, and it is affirmed.

AFFIRMED.